# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

SHEILA M. MARSHALL,

      Plaintiff,

      v.

UNIVERSITY OF MARYLAND MEDICAL
CENTER,

      Defendant.

Civil Action No. TDC-17-2779

## MEMORANDUM OPINION

Plaintiff Sheila M. Marshall, a nurse formerly employed by the University of Maryland Medical Center ("UMMC"), has filed suit against UMMC alleging disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213 (2018), and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code Ann., State Govt., §§ 20-601–20-1203 (West 2015), as well as a common law claim of retaliatory wrongful discharge. UMMC has moved for summary judgment on all of Marshall's claims. Marshall opposes the Motion. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, UMMC's Motion for Summary Judgment will be GRANTED.

## BACKGROUND

Marshall was hired by UMMC as a nurse in 2009 and by 2014 was working as a Senior Clinical Nurse I. At that point, Marshall was halfway through an educational program through which she would obtain a bachelor's degree in the Science of Nursing ("BSN"), a degree required for the Senior Clinical Nurse I position and which Marshall was expected to earn by July 2015.

On July 8, 2014, she suffered an on-the-job musculoskeletal injury to her back after she attempted to hold down a combative patient.

## I.      Job Placement Accommodation

After her injury, Marshall remained on leave until September 8, 2014, when she returned to work in a light duty position in the Medical Intermediate Care unit and was restricted to two work days per week of three hours per day.  Over the next year, Marshall remained in light duty positions as she underwent treatment for her injuries.  In November 2014, after the Medical Intermediate Care unit position was eliminated, Marshall was transferred to a suitable, light duty position in the Bariatric Surgical Office.  In June 2015, Marshall was briefly transferred to a light duty position in the Liver Transplant Office, then was transferred in October 2015 to a light duty position as a Utilization Management Specialist, or Utilization Reviewer, in the Case Management Office.

In November 2015, Marshall's physician determined that Marshall had reached maximum improvement for her injuries and thus would be unable to return to her previous job as a bedside nurse.  He noted that she could not lift more than 10 pounds, could not stand for more than an hour, could not sit for more than an hour, and could not at that time tolerate a 40-hour work week.

In January 2016, a full-time position as a Utilization Reviewer in the Case Management Office, in which Marshall was then on temporary light duty assignment, was advertised. Utilization Reviewers are nurses who work with a patient's medical team to assess the appropriate use of resources for that patient based on national guidelines.  One of the requirements of the position is a BSN degree.  On February 10, 2016, Stacey Caprino, a  UMMC Human Resources ("HR") official, emailed Marshall to offer her the opening, which paid $35.99 per hour, a rate comparable to Marshall's bedside nursing rate.  Caprino explained that in order to effect the

2

permanent transfer, Marshall would have to apply for the position, after which an offer letter would be generated and she could be officially on-boarded.   When Marshall stated she had questions about the position, Caprino offered to set up a meeting to discuss it, but Marshall was unresponsive for several weeks. After a follow-up inquiry by Caprino on February 25, 2016, in which she set a March 2, 2016 deadline for Marshall to apply for the position, Marshall responded that she wanted to discuss in more detail the requirements of the job, and she asked why she had to apply for the position at all, rather than just being transferred. Caprino and Marshall met on March 4, 2016, and Marshall expressed her concerns about the BSN requirement and position's salary.  Caprino informed Marshall that she did not need to have her BSN to take the position but instead would be given 36 months to complete the remaining requirements for her BSN degree.  Caprino also clarified that Marshall would be paid at a 0.6 full-time equivalent ("FTE") rate, meaning that she would be paid for a 24-hour, not 40-hour, work week based on the restrictions imposed by her doctor, but that she could increase the number of hours worked per week if her doctor provided a note certifying that she could handle the additional workload. UMMC gave Marshall until March 8 to apply for the position.  Marshall failed to do so.

On March 15, 2016, Caprino sent to Marshall two lists of other possible openings.  On March 18, Marshall clarified that she remained interested in the Utilization Reviewer position but was concerned that she did not meet the requirements.  That same day, Marshall was again offered the position and was asked to make a decision that day.  Marshall asked to have her pending requests for specialized equipment to accommodate her disability, consisting of a standing desk, chair, and phone headset, resolved before she made a decision.  UMMC stated that she would have until one week after the specialized equipment was delivered to give her answer as to the Utilization Reviewer position, which would be held for her in the meantime.  On April 19, 2016,

3

after she had received the requested standing desk and chair, Marshall met with Caprino and another HR official and told them that she remained concerned that she did not meet the BSN requirement and lacked the ability to work 40 hours per week. Although Caprino reiterated that Marshall would be able to work at a 0.6 FTE and be given 18 months to complete her BSN, she declined the position, which was then released for consideration of other candidates.

Marshall was then sent a list of other possible positions and was scheduled to meet with Caprino about them on April 29, 2016. Marshall missed that meeting, then missed a rescheduled meeting on May 6 and a second rescheduled meeting on May 10. On May 24, 2016 and June 3, 2016, Caprino provided Marshall with additional job descriptions, including positions as a Liver Transplant Coordinator, a Post-Transplant Coordinator, and a Heart-Lung Transplant Coordinator. In response, in a June 7, 2016 email, Marshall expressed her desire to continue working in a nursing position, stating that she needed a position that paid her present hourly rate, and explained that she believed the coordinator positions were unsuitable because "as of now I shouldn't have any hands-on patient interactions" and because of other, unspecified concerns about which she would have to consult her attorney. Joint Record ("J.R.") 27, ECF No. 75. That same day, Caprino learned that Marshall had filed a Charge of Discrimination against UMMC.

At some point, Marshall was placed on paid administrative leave as UMMC searched for a suitable position for her. On June 29, 2016, after another Utilization Reviewer position became available, Caprino offered it to Marshall on the same terms as before, including the 18 months to complete her BSN. Caprino noted that any position requiring Marshall to use her training as a Registered Nurse would also require her to complete her BSN, and that non-BSN positions paid significantly less. Caprino asked Marshall to inform her, in writing, of the reasons Marshall did not believe herself to be qualified for the position and stated that if no reasons were received or

4

the reasons were not legitimate bases to reject the position, Marshall's leave would be converted to an unpaid leave of absence as UMMC looked for other placements. On July 6, 2016, Marshall responded that she continued to have reservations about the education requirement and the pay. She noted that, in light of her condition, she was not certain that 18 months would be enough time to complete her BSN degree. As to the pay, she asked for a breakdown of what the 0.6 FTE salary would actually pay her.

In response, Caprino again clarified in a July 12, 2016 email that Marshall was required to enroll in a BSN program within 18 months and complete it within 36 months. Caprino also explained that the 0.6 FTE was prorated from the full-time salary of $74,859.20. Caprino concluded that because Marshall had not identified a legitimate reason to reject the Utilization Reviewer position, Marshall would be placed on unpaid leave, effective July 13, 2016.

In a July 14, 2016 email, Marshall stated that she understood that she was to continue to work in her temporary Utilization Reviewer position until UMMS found her another position. On August 2, 2016, Caprino informed Marshall that she could return to that position on a temporary basis on August 8, 2016 and would receive back pay for the period of unpaid leave. On August 5, 2016, however, Marshall emailed Caprino to tell her that her doctor had "taken [her] out of work until further notice." J.R. 35.

On January 10, 2017, Marshall was cleared by her doctor to return to work, with the restrictions that she be on light duty in a non-clinical setting working no more than 13.5 hours per week. Caprino informed Marshall of several per diem positions—positions for which hours were not guaranteed—including one as a Nurse Audit Specialist, which required four years of nursing experience and two years of utilization review or case management experience. Marshall expressed interest in the Nurse Audit position, but was ultimately not offered it because she lacked

5

the requisite case management experience and the position required full-time work. On February 17, 2017, Marshall was provided information about a part-time Case Manager position. On March 13, 2017, Marshall contacted HR to question the decision not to offer her the Nurse Audit position, to request the ADA requirements for the Case Manager position, and to discuss whether there were any guaranteed hours with that position. Though Marshall was sent the ADA requirements and a list of other open positions, she failed to respond to several follow-up communications. On April 12, 2017, UMMC wrote to Marshall, noted that it had attempted to place her in a vacant position for 14 months without success, and terminated Marshall's employment, effective that day.

## II.   Workplace Equipment Accommodation

Following Marshall's injury and within the time period during which UMMC and Marshall were discussing a new position for her, Marshall sought specific work equipment as a reasonable accommodation to her disability. On September 25, 2015, while Marshall was still working in temporary light-duty positions, her physician submitted an "Electronic Requisition" requesting that she receive for use at UMMS a phone headset, a standing desk, and a "custom chair to lessen pressure off of coccyx and back." J.R. 36. That document was received by UMMC on October 2, 2015 but was not accompanied by a permanent accommodation request, which was not received until November 16, 2015. On December 2, 2015, Caprino emailed Jim Chang, the UMMC Director of Safety, to ask whether UMMC already had the requested items and about the process for acquiring them. Chang responded on December 7, 2015 with a request for Marshall's name and work location, which Caprino provided on December 17. On January 6, 2016, Caprino was informed by Linda Whitmore of the Facilities-Project Development Department ("Facilities") that UMMC did not have a standing desk, but that a vendor had been contacted for options. By January 22, 2016, the vendor had responded, and Caprino met that day with Marshall to discuss the

6

available options. Based on that meeting, Marshall agreed to show the desk options to her doctor

for approval. Caprino, in turn, left with the understanding that, as to the chair, Marshall needed

one that would take the pressure off her spine, and, as to the headset, there was no urgent need

because Marshall was not on the phone as much as she used to be.

That same day, Caprino asked Whitmore if there were chairs and headsets in storage that

might work or, if not, whether vendors could be contacted for additional options. Later on January

22, Caprino sent to Marshall information about two possible chairs and requested that she consult

her doctor about them and provide his written recommendation on whether one would be

appropriate. During another meeting about the requested equipment on February 1, 2016, Caprino

informed Marshall that in order for UMMC to order the equipment, it needed her doctor's express

statement that the proposed equipment met Marshall's needs, or that other specific equipment

would do so. In an email that same day, Marshall expressed her concern about the chairs' lack of

cushioning but stated that she would forward the images to her doctor for his input.

In a February 11, 2016 email about the Utilization Reviewer position, Marshall remarked

that her concerns about that position included "the issue of me waiting for the proper equipment

to work properly such as Standing desk, Special chair and head phone set." J.R. 48. Caprino

responded that same day, asking Marshall the status of securing approval from her doctor for the

proposed items and stating that upon such approval, they could order the items. On February 18,

2016, Marshall emailed to Caprino a February 12, 2016 letter from her doctor "for approval of the

standing desk and special cushioned chair." J.R. 49. That letter, however, only stated generally

that Marshall needed a standing desk and cushioned chair in order to continue working but did not

approve the specific equipment proposed by UMMC. On February 25, 2016, Caprino responded

to Marshall's email, thanking her for the letter but informing her that it was inadequate because

7

the doctor had not specifically stated that the equipment proposed on January 22, 2016 was adequate to meet her needs. Caprino reiterated that UMMC needed Marshall's doctor "to specifically approve one of the chair and one of the desk options that we provided to you," or, if the proposed equipment was unsuitable, to "provide us with a chair and desk option that he recommends." J.R. 49.

Then, on March 1, 2016, Caprino emailed Facilities to ask if there was anyone who could assist with the "urgent request" to order a "standing desk that glides up and down (not one with a hand crank)" for Marshall and whether there was a desk chair with good lumbar support that Marshall could use in the short term. J.R. 52. Caprino explained as to the chair that they were waiting to hear back from Marshall's doctor whether any of the proposed chairs would suit Marshall's needs. The next day, Jane Wood, who worked in Facilities, sent an "[u]rgent" email asking staff about finding a standing desk that glides up and down, asking to be informed "asap" of what was available, and to "please include quotes to expedite the process." J.R. 53. The next day, Wood and Chang went to Marshall's workspace to determine the appropriate size for the desk. While there, Wood "could tell" that Marshall "was definitely not comfortable" in her desk chair, so she informed Caprino that they would be finding her a better one. J.R. 56. On March 4, 2016, Joshua Ayres, Marshall's interim manager, informed Wood that he had found office space with power and an internet connection that could accommodate a standing desk.

By March 9, 2016, Facilities was still researching possible standing desks. On March 11, Wood circulated a brochure for the HumanScale Quickstand Desk to Caprino and others and asked if it was an acceptable option. Caprino asked Wood to review it that day with Marshall. On March 15, Rebecca Hielke, a UMMC Employee and Labor Relations Advisor, suggested that UMMC no longer require Marshall's doctor to approve the specific equipment "to try to limit

putting any more hurdles up to getting the equipment." J.R. 69.  Accordingly, Caprino emailed

Marshall to ask if that desk would meet her needs and stated that they could order it if she approved

it, even without doctor approval.

In the same timeframe, Wood emailed Marshall information about the "Zody Ergo" chair

and the "HumanScale Freedom" chairs. J.R. 68, 71.  In a March 18, 2016 email, Marshall informed

Wood that the HumanScale Freedom chair and a different desk, the WORKFIT-S Dual standing

desk, appeared suitable.  At some point, Wood, a UMMC ergonomics expert, and a chair vendor

met with Marshall to answer her questions and let her try out the possible equipment.

By March 24, 2016, Marshall's standing desk had been ordered, and by March 31, 2016,

Marshall had received both the desk and the chair.  Marshall never received a headset, but she was

permitted to use a speaker phone for calls.

## III.    Workplace Harassment

According to Marshall, upon her September 2014 return to UMMC after her injury, she

was subjected to harassment and mistreatment.  In her estimation, the "single worst act of

harassment" was that she was "subjected to ... a substance or something" in various workspaces

that created a "distortion of [her] thinking." J.R. 242, 244.  Marshall was unable to identify the

substance but sensed that the air in her immediate work area was muggier than in other areas.  She

perceived the substance in the Case Management Department as well as the Liver Transplant

Department.  Though she reported the matter to security personnel, she did not receive answers

about the alleged substance, and she suspects that the substance was a form of "attacking" her

because "they wanted me to go." J.R. 247-48.

Marshall has alleged other incidents of what she considers to be harassment.  On one

occasion, she was asked by Linda Ridge, her manager in the Liver Transplant Office, to perform

a task right before she supposed to leave work for the day. During the ensuing conversation, Marshall asked Ridge to train her properly on certain tasks, but Ridge responded that because Marshall was only temporarily assigned to that office, she could not train her, even though she was in the midst of training two other new, permanent staff members. On another occasion, during a fire drill, Ridge attempted to prevent Marshall from taking the elevator even though her disability made it difficult to use the stairs. Marshall ultimately took the elevator down with hospital patients, while all other staff members took the stairs.

Another incident occurred when Marshall walked past staff members from the Kidney Transplant Office and Liver Transplant Office and overheard someone say, "she is a liability." J.R. 251. She could not tell whether the comment was directed at her but suspected that it was because personnel in the Liver Transplant Department "had attitudes and they didn't want to help me." *Id.* She also considered air blowing on her from vents to be a form of harassment, and when she requested that Ridge turn it down, whatever action Ridge took had no discernible effect. Marshall also asserts that while she was working in the Bariatric Department, a co-worker named Ashley harassed her when, after usually greeting her by saying "good morning" or something similar, she began to greet her by saying "what's up, girl?" J.R. 253. Marshall felt the greeting was "too persistent at times," so it felt "really unwelcoming." *Id.*

The alleged harassment also included the disturbing of items in Marshall's workplace. In one of her positions, she used a cardboard box to increase the height of her keyboard to alleviate her back pain. When she returned to work after being out for a week, the box was gone. Another incident occurred while Marshall was working in the Case Management Office, in which she did not have her own workstation and instead had to use whatever computer was open. Because she had her own chair to address her disability, at any given workstation she removed the regular chair

and used her own chair, sometimes leaving it there at the end of her shift.  On one such occasion, she returned to work to find a note on her chair reading, "Respect, Courtesy, and Consideration... Please remove your chair at the end of your shift [and] replace the other person's chair ... Please [and] thank you!"  J.R. 399.

## IV.    Workers' Compensation and Discrimination Complaints

In July 2014, in the weeks after her injury, Marshall filed a workers' compensation claim based on the injury, and UMMC was immediately notified of that claim.  Caprino herself learned of that claim no later than March 2015.  In April 2016, Marshall filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), asserting claims of disability discrimination and retaliation.  On June 7, 2016, Caprino learned of the Charge of Discrimination ("the EEOC Charge").  In April 2017, Marshall attended a workers' compensation hearing at which she testified in response to a question by the UMMC attorney that she had filed her discrimination complaint against UMMC.  Approximately three days later, on April 12, 2017, Marshall was notified that she had been terminated, effective that day.

On September 19, 2017, after the EEOC issued a right-to-sue letter on her claim, Marshall filed suit in this Court asserting five causes of action: (I) a claim for disability discrimination under the ADA based on the alleged failure to provide reasonable accommodations for her disability and on her eventual termination; (II) a claim for disability discrimination under FEPA based on her termination; (III) a retaliatory discharge claim under the ADA; (IV) a retaliatory discharge claim under FEPA; and (V) a common law retaliatory wrongful discharge claim based on the filing of her workers' compensation claim.  The Court construes Count I to assert claims based on the alleged failure to accommodate Marshall's disability by finding her an alternative

position at UMMC and instead terminating her, and by failing to provide her with the work equipment she needed.

## DISCUSSION

In its Motion, UMMC asserts that it is entitled to summary judgment on the failure-to-accommodate claims in Count I of the Complaint because the record establishes that (1) UMMC accommodated her disability by transferring her to suitable, temporary light duty positions and then offered her a comparable permanent position that accommodated her needs, only to have Marshall reject that position; and (2) UMMC diligently engaged in an interactive process to find suitable work equipment to accommodate her disability, and such equipment was ultimately provided. Based on the same record, UMMC argues that it is entitled to summary judgment on the ADA and FEPA claims in Counts I and II that the termination of Marshall constituted discrimination based on disability. As to Marshall's ADA and FEPA retaliatory discharge claims in Counts III and IV, UMMC argues that summary judgment is warranted because Marshall cannot show causation between her protected activity and her discharge, or that the stated reasons for her discharge were pretextual. Similarly, UMMC argues that Marshall's common law wrongful discharge claim in Count V fails because there is no causal connection between her filing of a workers' compensation claim and her termination. Even though no hostile work environment claim is pleaded in the Complaint, UMMC argues for summary judgment on any such claim because the evidence does not support a finding that Marshall was subjected to a hostile work environment.

In opposing the Motion, Marshall asserts that there are material disputes of fact whether the delay in providing the work equipment amounted to a failure to accommodate, whether that delay was retaliatory, whether Marshall's work environment was hostile, and whether her

discharge was in retaliation for her workers' compensation claim. She does not oppose UMMC's arguments on, and thus appears to have abandoned her claims relating to, the alleged failure to accommodate her disability by offering her an alternative position and the alleged discriminatory termination based on her disability.

## I.     Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II.    Disability Discrimination

In the Complaint, Marshall asserts that UMMC engaged in disability discrimination by failing to provide reasonable accommodations of her disability by (1) failing to provide her with an alternative position that accommodated her disability, instead of terminating her; and (2) delaying  in providing her with a standing desk, special chair, and phone headset necessary to accommodate her disability. The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A qualified individual with

a disability is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995). In order to establish a *prima facie* case of discrimination based on a failure to accommodate under the ADA, a plaintiff must demonstrate that (1) the plaintiff was an individual who had a disability within the meaning of the statute; (2) the employer had notice of the disability; (3) with a reasonable accommodation the plaintiff could perform the essential functions of the position sought; and (4) the employer refused to make such an accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013); *see Peninsula Regional Med. Ctr. v. Adkins*, 137 A.3d 211, 223–24 (Md. 2016) (using decisions interpreting the ADA to construe the scope of FEPA).

### A.    Discharge

In the Complaint, Marshall appears to allege in Counts I and II that UMMC violated the ADA and FEPA by failing to accommodate her disability by providing an alternative position and instead terminating her. UMMC asserts that it is entitled to summary judgment on this claim because the evidence establishes that it made repeated efforts to place Marshall into positions comparable to her original position that she could perform even with her disability, most specifically the Utilization Reviewer position, which she was offered three different times, but Marshall refused to accept any such positions. Marshall has failed to oppose UMMC's Motion as to these claims, and thus must be construed as having abandoned them. *See Satcher v. Univ. of Ark. At Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (holding that a "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that the plaintiff had abandoned

a claim "by failing to address that claim in her opposition to [the defendant's] motion for summary judgment, or to offer clarification in response to [the defendant's] reply brief").

Even if Marshall were not found to have abandoned this claim, UMMC would be entitled to summary judgment on it. Although the first three elements of a *prima facie* case are largely undisputed, the uncontested evidence establishes that Marshall cannot establish the fourth element because she was repeatedly offered a position as a Utilization Reviewer, a job that had a comparable pay rate to her clinical nursing position, and was terminated only after she declined that position. An employer "may reasonably accommodate an employee without providing the exact accommodation that the employee requested." *Reyazzudin v. Montgomery Cty.*, 789 F.3d 407, 415 (4th Cir. 2015). The accommodation chosen by the employer need not be the "'best' accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated." 29 C.F.R. pt. 1630 app. § 1630.9 (2016). Under the ADA, a reasonable accommodation may include a reassignment to a vacant position. 42 U.S.C. § 12111(9).

Marshall's objections to the Utilization Reviewer position were that it required her to earn her BSN within 36 months of enrolling in a program, which had been a condition of her prior nursing role and which she did not establish to be precluded by her disability, and that she would be paid only for the hours she worked, rather than given a full-time salary for working fewer than 40 hours. The failure to offer full-time pay for part-time work did not render the Utilization Reviewer an unreasonable accommodation. *See Myers v. Hose*, 50 F.3d at 283 (4th Cir. 1995) (holding that the reasonable accommodation requirement did not require an employer to give an employee paid leave in excess of his annually scheduled amount). Though the position did not involve any bedside nursing, Marshall herself acknowledged that she was no longer capable of hands-on patient interactions. Notably, the record also establishes that UMMC made substantial

efforts to identify other comparable positions, several of which Marshall declined to consider. In light of these facts, Marshall cannot demonstrate that there is a genuine issue of material fact on whether UMMC refused to offer her a reasonable accommodation in the form of a comparable position before terminating her. UMMC will be granted summary judgment on the claims in Counts I and II of disability discrimination based on Marshall's termination without having been offered a reasonable accommodation of a comparable position.

**B.   Work Equipment**

Marshall also claims a discriminatory failure to provide a reasonable accommodation of her disability arising from her request for work equipment necessary for her to perform her job, specifically a standing desk, special chair, and a phone headset. Here, it is undisputed that the first three elements of the *prima facie* case have been established. As for whether the employer refused to provide reasonable accommodations, it is undisputed that Marshall eventually received the first two items, and she was allowed to conduct work phone calls using a speaker phone and has not demonstrated that such an accommodation was insufficient. The Court therefore finds that there was no refusal to provide a reasonable accommodation.

The inquiry does not end there because Marshall argues that the delay in providing the accommodations was itself a violation of the ADA. To determine whether and how to provide an appropriate reasonable accommodation, employers are required to initiate "an informal, interactive process with the individual with a disability to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3) (2020). This interactive process "is not an end in itself." *Wilson*, 717 F.3d at 347 (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000)). Thus, a complete failure on the part of an employer to engage in the interactive process is not

16

independently actionable if no reasonable accommodation could have been found. *Id.* However, while "employers need not immediately implement or accept accommodations proposed by an employee" and need not move "with maximum speed in addressing a request for accommodations," an "unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate." *Farquhar v. McCarthy*, ___ F. App'x ___, No. 19-1406, 2020 WL 4558949, at *2 (4th Cir. Aug. 7, 2020) (discussing a failure to accommodate under the Rehabilitation Act) (citations omitted); *see also McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020). In making a determination about the unreasonableness of a delay, "[n]o hard and fast rule will suffice." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (quoting *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135–36) (7th Cir. 1996)). Courts instead consider the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith. *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262–63 (10th Cir. 2001).

In total, it took UMMC six months to provide Marshall with the accommodations she needed for her disability. UMMC received the "Electronic Requisition" from Marshall's doctor on October 2, 2015, but that original requisition was not supplemented with a permanent accommodation request until November 16, 2015. Because employers are within their rights to ask for documentation of the need for an accommodation before providing any such accommodation, 29 C.F.R. pt. 1630 app. § 1630.9, there is no basis to find that this initial delay between the requisition and the request for a permanent accommodation was unreasonable.

The documentary evidence establishes that once UMMC had the permanent accommodation request, there was steady, regular communication from UMMC to Marshall about

17

her needs, UMMC made affirmative efforts to research and identify suitable items, and Marshall was effectively given her pick of various desk furniture options. Within three weeks of receiving the permanent request, Caprino had begun inquiries into whether an appropriate desk and chair were available, and by January 2016, UMMC had checked to see if it had suitable items in storage, which it did not, and it was researching specific products for consideration. Caprino and Marshall met twice to determine what type of equipment would be suitable, Caprino proposed specific items, and in order to ensure that Marshall's needs were met, she asked Marshall to secure her doctor's official approval of the particular products or to recommend other products. Over the next month, the process slowed because a response from Marshall's doctor was not quickly forthcoming, and a February 2016 letter from Marshall's physician provided no approval or recommended products. Nevertheless, UMMC officials continued to identify and send information on multiple standing desks and chairs, met with Marshall at least two more times, including one meeting that included external vendors who brought product samples for Marshall to try, and then, on its own, abandoned its requirement of physician approval and simply asked Marshall to select a suitable item. Marshall, meanwhile, was reminded on multiple occasions by Caprino or Woods that they were waiting for her decision on the equipment.

The documentary record thus establishes that UMMC engaged in consistent, frequent communication with Marshall about the accommodations and made ongoing efforts to identify suitable products, and it demonstrates that delays in communication were in significant part the result of time periods during which UMMC was awaiting a response from Marshall, either to provide her own views about specific products or to secure information from her doctor on the suitability of the proposed desk equipment. *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) (stating that the court "should attempt to isolate the cause of the

breakdown and assign responsibility" and consider whether "the missing information is of the type that can only be provided by one of the parties"). The record also establishes that Marshall was affirmatively included in the accommodation process, so much so that she was given the opportunity to try out and ultimately herself select her desk furniture.

Where UMMC was actively engaged in the interactive process, the length of that process was attributable in part to delays caused by Marshall and her physician in responding to UMMC's inquiries and in part by the tailored nature of this effort to find her specific items of desk furniture that would meet her individual needs, the Court concludes that no reasonable jury could conclude that UMMC failed to participate in the interactive process in good faith such that the six-month delay amounted to a failure to accommodate. *See Matos v. DeVos*, 317 F. Supp. 3d 489, 494–95, 497 (D.D.C. 2018) (finding no triable issue of fact as to a failure to accommodate where there was a seven-month delay in providing equipment that was the result of "back-and-forth" to "find the right configuration of equipment that worked to alleviate [the employee's] symptoms"); *West v. New Mexico Taxation and Revenue Dept.*, 757 F. Supp. 2d 1065, 1124 (D.N.M. 2010) (granting summary judgment to the defendant where a six-month delay in providing a reasonable accommodation resulted in part from the failure of the plaintiff's healthcare provider "to respond to the Defendants' repeated requests for additional clarifying information").

**III.   Retaliation**

In Counts III and IV, Marshall asserts that UMMC engaged in unlawful retaliation against her for filing a disability discrimination complaint with the EEOC by terminating her within a few days after she testified in an April 2017 workers' compensation hearing that she had filed her discrimination complaint against UMMC. The ADA's retaliation provision provides, in relevant part, that "[n]o person shall discriminate against any individual because such individual ... made a

19

charge ... under this chapter." 42 U.S.C. § 12203(a).  To establish a *prima facie* case of retaliation under the ADA, a plaintiff must produce evidence establishing that (1) the plaintiff engaged in protected activity; (2) the employer acted adversely to the plaintiff; and (3) the protected activity was causally linked to the adverse action. *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). Because protected activity consists of opposing discrimination, the filing of a complaint of disability discrimination, such as Marshall's EEOC Charge, constitutes protected activity, while the filing of a workers' compensation claim does not. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216–17 (4th Cir. 2002) (finding no ADA retaliation claim because the plaintiff could not reasonably believe that the conduct she had opposed violated the ADA, even though it could have violated state medical malpractice law); *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 685–86 (4th Cir. 2009) (emphasizing that, when applying Title VII retaliation analysis to an Age Discrimination in Employment Act claim, "it is fundamental" that a plaintiff must have engaged "in activities opposing discrimination").

Since the ADA mirrors and specifically refers to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018), and "the two statute share the same purpose, courts confronted with ADA claims have also frequently turned to precedent under Title VII." *A Helping Hand, LLC v. Balt. Cty.*, 515 F.3d 356, 362 (4th Cir. 2008) (citation omitted).  Thus, an ADA retaliation claim may be analyzed under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006).  Under this approach, if a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for termination. *See id.* at 551.  If the defendant makes such a showing, the burden then shifts back to the plaintiff to show that the stated reason was pretextual and that retaliation was the "actual

reason" for termination. *See Foster v. Univ. of Md.—E. Shore*, 787 F.3d 243, 253–54 (4th Cir. 2015).

Causation must be established at two stages of the *McDonnell Douglas* framework: first, in making a *prima facie* case, and second, in proving pretext and satisfying the ultimate burden of persuasion. *Foster*, 787 F.3d at 250. The difference between the two stages is that the burden for establishing causation at *the prima facie* stage is "less onerous." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). A causal connection "exists where the employer takes [an] adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). At the *prima facie* stage, causation may be established by the proximity between when the protected activity took place and when the employee was subjected to a materially adverse action. *See id.* ("Appellant's proof of a causal connection between the protected activity and her discharge essentially was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.").

As an initial issue, although in the Complaint Marshall alleged unlawful retaliation based on her termination from employment, in her brief on the Motion Marshall recasts the claim, adding that the failure to provide workplace equipment in a timely manner was retaliatory. The Court cannot consider this additional theory of retaliation because "[i]t is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). The Court therefore considers the retaliation claims only as to Marshall's ultimate termination.

On that issue, UMMC asserts that the evidence does not support even a *prima facie* case of retaliation because she establishes no causal connection between her protected activity and her termination. Here, Marshall engaged in protected activity when she filed the EEOC Charge in April 2016, then was subjected to the adverse employment action of termination one year later, on April 12, 2017. Ordinarily, a one-year gap between these events cannot support a finding of causation absent other evidence. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that while there is no bright line rule, the temporal nexus must be "very close" to establish causation); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding that two months and two weeks separating the time between the protected activity and the plaintiff's termination was "sufficiently long so as to weaken significantly the inference of causation between the two events"). Marshall seeks to shrink that gap by focusing on the fact that in April 2017, only days before her termination, she testified at a workers' compensation hearing, in the presence of UMMC officials, that she had filed a discrimination complaint against UMMC.

This fact does not establish causation because it is undisputed that UMMC was aware of Marshall's EEOC Charge as of June 7, 2016, when Caprino learned of it. Significantly, in the 10 months between then and Marshall's termination, UMMC continued to make substantial efforts to find Marshall an alternative position within UMMC. On June 29, 2016, after another Utilization Reviewer position became available, Caprino offered that position to Marshall for a third time, on the same terms as before, including that the pay rate would be comparable to her original position, the pay would be prorated for her part time work, and she would be given 36 months to attain her BSN degree, as required for that position. Even after Marshall rejected that offer and was placed on unpaid leave, in August 2016, Caprino permitted Marshall to return to a temporary Utilization Reviewer position and to receive back pay for the period of unpaid leave. Then, after Marshall

was on leave for several months at the direction of her doctor and returned in January 2017, Caprino provided information on several other openings, including a Case Manager position for which Marshall asked some questions but did not apply. Where UMMC was fully aware of the EEOC Charge 10 months before Marshall's termination and nevertheless continued extensive efforts to find her an alternative position within UMMC, the fact that Marshall mentioned her EEOC Charge at the workers' compensation hearing in April 2017 does not create a genuine issue of material fact on the issue of causation. This conclusion applies both at the *prima facie* stage and at the stage of the ultimate burden of persuasion, because where the evidence is more than sufficient to establish a legitimate non-retaliatory reason for the termination in the form of the inability to find a suitable position that Marshall would accept, this record would not support a finding that this reason was pretextual and that retaliation was the cause of the termination. Particularly where within a few weeks after it learned of Marshall's filing of the EEOC Charge, UMMC made the same offer of a reasonable accommodation that it had made before she filed the EEOC Charge, the Court concludes that no reasonable factfinder could conclude that Marshall's termination was casually connected to her protected activity. The Court will grant the Motion as to Counts III and IV.

## IV.    Wrongful Discharge

For similar reasons, UMMC will be granted summary judgment on Marshall's common law wrongful discharge claim, under which Marshall asserts that she was terminated because she filed a workers' compensation claim relating to her injury. On such a claim, a plaintiff must establish that (1) the employee was discharged; (2) the alleged basis for discharge violated some clear mandate of public policy; and (3) there is a nexus between the employee's conduct and the decision to fire the employee. *Wholey v. Sears Roebuck*, 803 A.2d 482, 489 (Md. 2002).

Here, the first two elements are satisfied. There is no dispute that Marshall was terminated, and a termination in retaliation for the filing of a workers' compensation claim is actionable in Maryland as a wrongful discharge. *See Ewing v. Koppers Co.*, 537 A.2d 1173, 1175 (Md. 1988) ("Discharging an employee solely because that employee filed a workers' compensation claim contravenes the clear mandate of Maryland public policy."). As to causation, however, the undisputed record establishes that Marshall filed her workers' compensation claim in July 2014, and that Caprino learned of that claim by March 2015 at the latest. As with the retaliation claim, the evidence does not support a finding of causation where after UMMC learned of the claim, it engaged in strenuous efforts to find Marshall an alternative permanent position. In addition to the actions in and after June 2016 that were discussed above in relation to the retaliation claim, *see supra* part III, Caprino offered the permanent Utilization Reviewer position to Marshall on two occasions in February and March 2016, then, when she failed to apply for it, sent information about multiple other positions, including positions as a Liver Transplant Coordinator, a Post-Transplant Coordinator, and a Heart-Lung Transplant Coordinator.

Where UMMC engaged in substantial efforts to place Marshall in a suitable new position over a 13-month period after it learned of the workers' compensation claim, the fact that Marshall testified at an April 2017 workers' compensation hearing shortly before her termination is insufficient to create a genuine issue of material fact on the issue of causation. The record provides no reason to conclude that any of Marshall's testimony revealed new information to UMMC. In fact, the record instead suggests that by April 2017, others involved in the efforts to accommodate Marshall, such as Hielke, who had participated in the efforts to find her a new position and to provide her with specialized work equipment, had likewise long been aware of both her workers' compensation claim and her discrimination claim. Accordingly, even viewing the facts in the light

24

most favorable to Marshall, the Court finds that the evidence does not support a finding of a causal nexus between the filing of her workers' compensation claim in July 2014 and her termination almost three years later.   UMMC's Motion will be granted as to Claim V.

**V.      Hostile Work Environment**

Although Marshall did not expressly plead a hostile work environment claim, the parties proceed as if such a claim has been an issue in this suit. The Court will therefore address the claim, noting again, however, that "parties cannot amend their complaints through briefing or oral advocacy." *S. Walk*, 713 F.3d at 184.

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that the offending behavior was (1) unwelcome; (2) based on a protected class; (3) "sufficiently severe or pervasive" to alter the conditions of employment and create "an abusive atmosphere"; and (4) imputable to the employer. *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207-08 (4th Cir. 2014) (quoting *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009)). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[C]allous behavior by [one's] superiors," *Bass v. E.I DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and

personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), in contrast, do not rise to the level of actionable harassment.

Here, Marshall has not presented sufficient evidence to support a claim of a hostile work environment. She provides no evidence demonstrating that the substance that she claims to have affected her, even if real, was actually part of a deliberate effort to harass her. None of Marshall's other allegations of workplace harassment rise beyond the level of a personality conflict and represent, at most, petty office dynamics that do not reach the necessary level of severe and pervasive "intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 277. They are not the kinds of conduct that a claim of a hostile work environment was meant to guard against. Finally, many of the comments to which Marshall objects were single statements made by co-workers or unidentified individuals, such that there is insufficient evidence to impute them to her employer. UMMC's Motion will be granted as to any hostile work environment claim.

## CONCLUSION

For the foregoing reasons, UMMC's Motion for Summary Judgment will be GRANTED. A separate Order shall issue.


Date: August 31, 2020

THEODORE D. CHUANG
United States District Judge

26